Electronically Filed
Intermediate Court of Appeals
CAAP-14-0001033
22-JAN-2018
08:10 AM

NO. CAAP-14-0001033

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


PELE DEFENSE FUND, a Hawaii non-profit corporation, et al.,
Plaintiffs-Appellants.
v.
DEPARTMENT OF LAND AND NATURAL RESOURCES,
DIVISION OF FORESTRY AND WILDLIFE, STATE OF HAWAI'I,
Defendants-Appellees


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 12-1-0568)


MEMORANDUM OPINION
(By:  Fujise, Presiding Judge, Reifurth and Ginoza, JJ.)

Plaintiffs-Appellants Pele Defense Fund, a Hawai'i non-profit corporation, Ralph Palikapu Dedman, Terri L. Napeahi, and John Joseph Griffiths, Jr., (collectively, **PDF**) appeal from the Amended Final Judgment entered in favor of Defendants-Appellees Department of Land and Natural Resources, Division of Forestry and Wildlife, State of Hawai'i (**DLNR**) on July 24, 2014, in the Circuit Court of the Third Circuit (**circuit court**).[1]

On appeal, PDF contends that the circuit court erred by: (1) applying an incorrect standard in reviewing an Environmental Assessment (**EA**) and Finding of No Significant Impact (**FONSI**) by DLNR, and failing to acknowledge that the Ka'ū

_____

[1]  The Honorable Glenn S. Hara presided.

Forest Reserve Management Plan (**Management Plan**) may have significant effects on the environment making a FONSI inappropriate; and (2) failing to award attorneys' fees under Hawaii Revised Statutes (**HRS**) § 607-14.5 (2016) due to DLNR's allegedly frivolous claim that the Management Plan was exempt from preparation of an EA.

For the reasons discussed below, we affirm.

## I.     Background

### A.     EA and FONSI

The Ka'ū Forest Reserve (**Reserve**) consists of 61,641 acres of state land located on the southeastern side of the island of Hawai'i.  The Division of Forestry and Wildlife (**DOFAW**) is the division within DLNR responsible for protecting, managing, and monitoring the resources in the Reserve.  As set out in the EA, the Reserve was established to "protect the forest on the lower slopes of Mauna Loa, with particular regard for water supply of the agricultural lands of Ka'ū."  The Management Plan states that the Reserve "is an important area for public use which includes hunting, recreational opportunities, cultural uses, personal gathering, and educational programs and activities."  Moreover, the Reserve contains a variety of endemic species of birds and plants.  The Reserve also provides a habitat for several endangered birds, including the Hawai'i Creeper, the Hawai'i 'Ākepa, and the Hawaiian Hawk (**'Io**).  The Management Plan notes that it is "one in a series of site-specific plans to be prepared by [DOFAW] for individual forest reserves in the State of Hawai'i."

The Management Plan proposes that the following management actions be undertaken as part of a fifteen-year management plan throughout or for selected areas of the Ka'ū Forest Reserve:

- Fence management areas in an approximately 12,000 acre portion of the Reserve and remove feral and introduced ungulates from within fenced management areas for watershed and native ecosystem health.

- Remove high priority non-native, invasive plants.

- Implement non-native predator control.

- Restore 'Alalā to the wild.

- Continue forest bird surveys to assess changes in bird population and distribution.

- Survey and inventory rare native plants and animals (including insects and snails).

- Improve habitat and recover rare and endangered plants by propagation and re-introduction of plants into appropriately fenced and protected habitat.

- Maintain existing public access roads and develop new routes to increase access, particularly across private and state-leased lands below the Reserve.

- Continue to facilitate public hunting in the Reserve by developing new access routes to increase hunter access.

- Develop trails and recreational amenities.

- Hire outreach staff and work with partners to provide outreach and education (e.g. volunteer service trips, student internships, and school programs) for the community to enhance public understanding of the Reserve's unique native forest.

- Respond to fires, as needed.

- Monitor forest for insects and disease and conduct other management as required (control of damaging insects, slugs, and/or plant disease).

- Consider environmentally and socially appropriate ways to make the Reserve economically self-supporting to support protection and management.

- Work with adjacent private landowners on cooperative management to make better use of limited funding and resources and more effectively manage interconnected landscapes.

On May 11, 2012, DLNR sent a Draft Environmental Assessment (**Draft EA**) of the Management Plan to the Office of Environmental Quality Control (**OEQC**). On May 23, 2012, the Draft EA was published in the OEQC's The Environmental Notice. After the thirty-day public comment period, and in response to the

3

comments, a Final Environmental Assessment (**Final EA**) was prepared.

In the Final EA, DLNR evaluated three alternative sites (Alternative A, B, and C) for implementation of the Management Plan.  All three alternatives included the "construction of 12,000 acres of new fenced management units in the upper elevation central portions of the Reserve in which ungulates will be removed and the native forest protected."  DLNR ultimately selected "implementation Alternative B, which involves the upper, central portion of the Reserve."

On September 28, 2012, the Board of Land and Natural Resources (**BLNR**) approved and accepted the Final EA, with issuance of a FONSI for the project.  The Final EA included the following: Final EA; Appendix 1 – Management Plan; Appendix 2 – Cultural Impact Statement; Appendix 3 – Public Involvement (Part A: Response to Early Consultation, Part B: Draft EA Release and Public Meeting Materials, and Part C: Comments to Draft EA and Responses).

On October 3, 2012, DLNR sent its Final EA of the Management Plan to the OEQC for publication in The Environmental Notice.  DLNR noted that "[d]uring the public comment period, written comments were received and responses were prepared for each comment" and after review of the comments and the Final EA, DLNR "has determined that this project will not have significant negative effect on the environment."  The Final EA and FONSI were published on October 23, 2012.

B.    **Lawsuit**

PDF filed a Complaint for Declaratory and Injunctive Relief (**Complaint**) on November 20, 2012, seeking to compel DLNR to comply with environmental review procedures outlined in the Hawaiʻi Environmental Protection Act (**HEPA**), HRS Chapter 343. PDF contended that the Management Plan "would have a significant effect on the environment of, and [plaintiffs'] interests in, the Kaʻu Forest Reserve[,]" and asserted that plaintiffs are entitled to temporary, preliminary and permanent injunctive relief to remedy DLNR's alleged violations of HRS Chapter 343.

On December 5, 2013, DLNR filed a motion for summary judgment contending, *inter alia*, that the Management Plan was exempt from the preparation of an EA.  DLNR asserted that despite the available exemptions, a decision was made to complete an EA for the Management Plan to "provide a further layer of review and protection, and to seek public comment regarding the proposed action."  DLNR also argued it was entitled to summary judgment because its determination and finding of no significant impact was supported under the rule of reason and DLNR's judgment that an environmental impact statement (**EIS**) was not required is entitled to deference.

On March 17, 2014, the circuit court entered its "Order Granting [DLNR's] Motion for Summary Judgment" and its Final Judgment.  PDF filed its first notice of appeal on April 5, 2014.  This appeal was docketed as CAAP-14-0000745.  On June 20, 2014, this court dismissed the appeal for lack of appellate jurisdiction.  On July 24, 2014, the circuit court entered the Amended Final Judgment.  On August 1, 2014, PDF filed a notice of appeal from the Amended Final Judgment.

## II.  Standards of Review

### A.  Summary Judgment

> On appeal, the grant or denial of summary judgment is reviewed *de novo*.  *See State ex rel. Anzai v. City & Cty. of Honolulu*, 99 Hawai'i 508, 514, 57 P.3d 433, 439 (2002); *Bitney v. Honolulu Police Dep't*, 96 Hawai'i 243, 250, 30 P.3d 257, 264 (2001).
>> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.  The evidence must be viewed in the light most favorable to the non-moving party.  In other words, we must view all of the evidence and inferences drawn therefrom in the light most favorable to the party opposing the motion.
> *Kahale v. City & Cty. of Honolulu*, 104 Hawai'i 341, 344, 90 P.3d 233, 236 (2004) (citation omitted).

*Nuuanu Valley Ass'n v. City & Cty. of Honolulu*, 119 Hawai'i 90, 96, 194 P.3d 531, 537 (2008).

### B. Constitutional Issues

"[T]his court reviews questions of constitutional law *de novo*, under the right/wrong standard." Haw. Gov't Emps. Ass'n, AFSCME Local 152, AFL-CIO v. Lingle, 124 Hawai‘i 197, 202, 239 P.3d 1, 6 (2010) (quoting Jou v. Dai-Tokyo Royal State Ins. Co., 116 Hawai‘i 159, 164-65, 172 P.3d 471, 476-77 (2007)).

### C. Attorneys' Fees

A trial court's denial of attorneys' fees is reviewed under the abuse of discretion standard. Yoneji v. Yoneji, 137 Hawai‘i 299, 309, 370 P.3d 704, 714 (App. 2016) (citing Allstate Ins. Co. v. Pruett, 118 Hawai‘i 174, 179, 186 P.3d 609, 614 (2008)). An abuse of discretion occurs if the trial court has "clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." TSA Int'l Ltd. v. Shimizu Corp., 92 Hawai‘i 243, 253, 990 P.2d 713, 723 (1999) (citation omitted).

## III. Discussion

### A. Standard for Reviewing the EA and FONSI

As a threshold matter, PDF contends that the circuit court erred by applying an incorrect standard in reviewing the EA and FONSI. Citing to HRS § 343-5(c)(4) (Supp. 2012), the definitions of an EA and FONSI set out in HRS § 343-2 (2010), and Hawai‘i Administrative Rules (**HAR**) § 11-200-12(b) (1996), PDF contends that "the proper inquiry for determining the need for an EIS is whether the proposed actions described in the EA are likely to have a significant effect on the environment." PDF asserts that the circuit court failed to apply this standard and instead improperly evaluated "whether an environmental impact statement should have been submitted on the basis of *procedural compliance rather than substantive effects.*" PDF contests, *inter alia,* the following conclusions made by the circuit court:

> The court applies a reasonableness standard as to the sufficiency of an agency's acceptance of an environmental document such as an EA, and addresses itself to whether "[the document] has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the

6

> environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives." Life of the Land v. Ariyoshi, 59 Haw. 156, 164-165, 577 P.2d 1116, 1121 (1978).
>
> The court concludes that the EA is sufficient under the standards set forth by HRS chapter 343 and HAR chapter 11-200, and further concludes that DLNR's determination of a FONSI was appropriate under the circumstances. Given the lack of any procedural defects in the environmental review document, the court further concludes as a matter of law that an environmental impact statement is not required.

(Emphasis added.)[2]

DLNR contends that pursuant to Price v. Obayashi Hawaii Corp., 81 Hawai'i 171, 182, 914 P.2d 1364, 1375 (1996), the "legal standard for any environmental review (EA or EIS) is whether, under the arbitrary and capricious standard, the agency has taken a hard look at environmental factors and reasonably

---

[2] PDF also contests the circuit court's findings of fact (**FOF**) 4-6 setting forth the court's summary of PDF's allegations, which PDF asserts is not fully correct. Further, PDF contests FOF's 8, 9, and 11, which state:

> 8. Having reviewed the FEA, Cultural Impact Assessment, Management Plan, and Public Comment components, the court makes the finding that the breadth, scope, and content of the documents were sufficient to adequately inform the decision-maker (i.e., DLNR) whether further environmental review (e.g., an environmental impact statement) is needed.
>
> 9. The court finds that matters regarding native Hawaiian rights and hunting access as raised by Plaintiffs have been sufficiently addressed in the FEA, in particular, at subparts 3.4 ("Cultural Resources" - p. 49 et seq.) and 3.5 ("Socioeconomic Conditions, Recreation and Public Health" - p. 65 et seq.). Matters regarding reintroduction of the captive 'alalā population to the wild have also been adequately addressed in various references throughout the FEA, Plan, and Public Comment components.
>
> . . . .
>
> 11. The court further finds that Plaintiffs have not shown an entitlement to injunctive relief in this case, and that the final EA sufficiently addressed matters as required by rule and statute, as to allow the head of the DLNR to reasonably conclude that the subject action under consideration will not have a significant effect on the environment.

sets forth sufficient information to enable the decision-maker [to make] a reasoned decision."

We do not agree with DLNR regarding the applicable standard in this case. Rather, as asserted by PDF, HRS § 343-5(c)(4) provides that an EIS "shall be required if the agency finds that the proposed action <u>may</u> have a significant effect on the environment[.]" (Emphasis added). In <u>Kepo'o v. Kane</u>, 106 Hawai'i 270, 288-89, 103 P.3d 939, 957-58 (2005), the Hawai'i Supreme Court concluded that "the term 'may' in HRS § 343-5(c) should be construed as 'likely' in common parlance. <u>The proper inquiry for determining the necessity of an EIS based on the language of HRS § 343-5(c), then, is whether the proposed action will 'likely' have a significant effect on the environment</u>." (footnote omitted)(emphasis added).

After the appellate briefs were filed in this case, the Hawai'i Supreme Court decided <u>Kilakila 'O Haleakala v. Univ. of Hawai'i</u>, 138 Hawai'i 364, 382 P.3d 176 (2016), which provides further guidance on the applicable standard for judicial review of a FONSI, such as in this case. Like this case, <u>Kilakila 'O Haleakala</u> arose as a declaratory relief action and addressed whether an EIS was required after an EA had been completed. <u>Id.</u> at 372-73, 382 P.3d at 184-185.

In <u>Kilakila 'O Haleakala</u>, the supreme court stated that "[f]or agency determinations under HEPA, 'the appropriate standard of review depends on the specific question under consideration.'" 138 Hawai'i at 375-76, 382 P.3d at 187-88 (quoting <u>Sierra Club v. Dept. of Transp.</u>, 115 Hawai'i 299, 315, 167 P.3d 292, 308 (2007)). The supreme court further stated that:

> [g]enerally, a court reviews agency determinations that involve factual questions under a clearly erroneous standard. [*Sierra Club*, 115 Hawai'i at 315, 167 P.3d 292 at (2007)]; <u>see</u> also *Del Monte Fresh Produce (Haw.), Inc. v. Int'l Longshore & Warehouse Union*, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006) ("[An agency's] conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case."). However, "[w]hether or not an agency has followed proper procedures or considered

8

> the appropriate factors in making its determination is
> a question of law, and will be reviewed de novo."
> Sierra Club, 115 Hawai'i at 315, 167 P.3d at 308.

Id. at 376, 382 P.3d at 188 (emphasis added).

A finding of fact or a mixed determination of law and fact made by an agency

> is clearly erroneous when (1) the record lacks
> substantial evidence to support the finding or
> determination, or (2) despite substantial evidence to
> support the finding or determination, the appellate
> court is left with the definite and firm conviction
> that a mistake has been made. Substantial evidence is
> credible evidence which is of sufficient quality and
> probative value to enable a person of reasonable
> caution to support a conclusion.

Del Monte, 112 Hawai'i at 499, 146 P.3d at 1076 (citations and internal quotation marks omitted).

In Kilakila 'O Haleakala, the University of Hawai'i (**UH**) conducted an EA regarding a management plan for an observatory site located on Haleakala, subsequently determined that the management plan would have no significant environmental impact, and thus did not prepare an EIS. 138 Hawai'i at 371-72, 382 P.3d at 183-84. The supreme court held that UH's negative declaration (*i.e.*, its determination that there would be no significant environmental impact) was "not clearly erroneous." Id. at 382, 382 P.3d at 194. Thus, in light of Kilakila 'O Haleakala, an agency's determination that a proposed action will likely have no significant impact on the environment is an issue that should be reviewed under the clearly erroneous standard.

In this case, the circuit court did not apply the correct standard. The circuit court cited to Life of the Land v. Ariyoshi, 59 Haw. 156, 577 P.2d 1116 (1978), which provided that:

> the standard of review which should govern a court's
> determination whether an EIS contains sufficient
> information to satisfy statutory requirements has been
> stated:
>
> 'In making such a determination a court is
> governed by the 'rule of reason,' under which an EIS
> need not be exhaustive to the point of discussing all
> possible details bearing on the proposed action but
> will be upheld as adequate if it has been compiled in
> good faith and sets forth sufficient information to
> enable the decision-maker to consider fully the
> environmental factors involved and to make a reasoned

> decision after balancing the risks of harm to the
> environment against the benefits to be derived from
> the proposed action, as well as to make a reasoned
> choice between alternatives.'

Id. at 164-65, 577 P.2d at 1121 (citation omitted).

In Life of the Land, the supreme court considered whether an EIS contained sufficient information, not whether an EIS was necessary following the completion of an EA and issuance of a FONSI.  59 Haw. at 158, 577 P.2d at 1118.  As discussed above, the correct standard to be employed by a reviewing court in the latter circumstance is whether the subject agency clearly erred in determining whether the proposed action will likely have a significant impact on the environment.  Thus, the circuit court applied the incorrect standard of review.  We will consider *de novo* whether, under the appropriate standard, summary judgment for DLNR was proper.

**B.    The Environmental Review Process in the Instant Case**

The general framework for HEPA is discussed in Kilakila ʻO Haleakala: "[i]f an action is subject to environmental review under HRS § 343-5(a) and is not declared exempt, the applicant of the proposed project or action must develop a draft [EA]."[3]  138 Hawaiʻi at 370, 382 P.3d at 182 (citation omitted).  Following completion of a draft EA, there is a thirty-day period for review and comment by the public.  Id.  After the review and comment phase, "the applicant responds to public comments and finalizes the draft [EA]" and then the "agency proposing or approving the action reviews the final [EA] to determine whether the proposed action could have a significant impact on the environment."  Id.

---

[3]  An EA is "an informational document prepared by either the agency proposing an action or a private applicant, which is used to evaluate the possible environmental effects of a proposed action."  Sierra Club, 115 Hawaiʻi at 307, 167 P.3d at 300.  "An environmental assessment must include the following: (1) a detailed description of the proposed action or project; (2) an evaluation of the direct, indirect, and cumulative impacts; (3) a discussion of alternatives to the proposed project or action; and (4) a description of any measures proposed to minimize potential impacts."  Kilakila ʻO Haleakala, 138 Hawaiʻi at 370, 382 P.3d at 182; see also HRS § 343-2.

(citing HRS § 343-2; HAR § 11-200-2 (1996); <u>Sierra Club</u>, 115 Hawai'i at 308, 167 P.3d at 301).  A "significant impact" is defined as:

> the sum of effects on the quality of the environment, including actions that irrevocably commit a natural resource, curtail the range of beneficial uses of the environment, are contrary to the state's environmental policies or long-term environmental goals and guidelines as established by law, or adversely affect the economic or social welfare, or are otherwise set forth in section 11-200-12 of this chapter.

HAR § 11-200-2.

In determining whether an action has a significant impact on the environment, the agency must consider certain "significance criteria" outlined in HAR § 11-200-12.[4]  <u>Kilakila</u>

---

[4]  HAR § 11-200-12 provides:

> §11-200-12 **Significance criteria**.  (a) In considering the significance of potential environmental effects, agencies shall consider the sum of effects on the quality of the environment, and shall evaluate the overall and cumulative effects of an action.
>
> (b)  In determining whether an action may have a significant effect on the environment, the agency shall consider every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action.  In most instances, an action shall be determined to have a significant effect on the environment if it:
>
> > (1)  Involves an irrevocable commitment to loss or destruction of any natural or cultural resource;
> >
> > (2)  Curtails the range of beneficial uses of the environment;
> >
> > (3)  Conflicts with the state's long-term environmental policies or goals and guidelines as expressed in chapter 344, HRS, and any revisions thereof and amendments thereto, court decisions, or executive orders;
> >
> > (4)  Substantially affects the economic welfare, social welfare, and cultural practices of the community or State;

(continued...)

'O Haleakala, 138 Hawai'i at 370, 382 P.3d at 182. Upon completion of the final environmental assessment, "if the reviewing agency determines that the proposed action is likely to cause a significant impact on the environment, an environmental impact statement must be prepared." Id. (citing Price, 81 Hawai'i at 180, 914 P.2d at 1373). However, if the reviewing agency determines "that the proposed action will not result in a significant environmental impact, then the agency must issue and publish a [FONSI] (i.e., a negative declaration)[.]" Id. at 370-71, 382 P.3d at 182-83. A FONSI is "a determination based on an [EA] that the subject action will not have a significant effect

---

4(...continued)

(5) Substantially affects public health;

(6) Involves substantial secondary impacts, such as population changes or effects on public facilities;

(7) Involves a substantial degradation of environmental quality;

(8) Is individually limited but cumulatively has considerable effect upon the environment or involves a commitment for larger actions;

(9) Substantially affects a rare, threatened, or endangered species, or its habitat;

(10) Detrimentally affects air or water quality or ambient noise levels;

(11) Affects or is likely to suffer damage by being located in an environmentally sensitive area such as a flood plain, tsunami zone, beach, erosion-prone area, geologically hazardous land, estuary, fresh water, or coastal waters;

(12) Substantially affects scenic vistas and viewplanes identified in county or state plans or studies; or,

(13) Requires substantial energy consumption.

and, therefore, will not require the preparation of an environmental impact statement." HRS § 343-2; see also HAR § 11-200-2. "Publication of a negative declaration initiates a thirty-day period during which that determination may be challenged through litigation." Kilakila ʻO Haleakala, 138 Hawaiʻi at 371, 382 P.3d at 183 (citing HRS § 343-7(b) (1993)).

In this case, on May 23, 2012, the Draft EA was published and public comment solicited. On October 3, 2012, DLNR sent notice to the OEQC, stating it had determined that the Management Plan would have no significant environmental impact. The Final EA and FONSI were published on October 23, 2012.

The Management Plan "proposes management actions to address threats and better protect the area." As noted above, the Management Plan proposes a list of management actions, including among other things, fencing management areas, removing ungulates, and restoring the ʻAlalā to the wild.

PDF challenges the circuit court's determination that DLNR's FONSI was appropriate, arguing that reintroduction of the ʻAlalā and removal of ungulates "must be presumed to have significant effects on the environment, requiring an EIS." PDF argues the FONSI determination does not consider the environmental impacts arising from these two actions.[5]

---

[5] PDF makes passing reference in its opening brief to other alleged impacts. However, PDF does not present substantive argument on the other alleged impacts and thus we need not address them. See Hawaiʻi Rules of Appellate Procedure (HRAP) Rule 28(b)(7) (requiring as part of the opening brief "[t]he argument, containing the contentions of the appellant on the points presented and the reasons therefor, with citations to the authorities, statutes and parts of the record relied upon. . . . Points not argued may be deemed waived."). Even if we considered PDF's general assertion that fencing would significantly impact the environment, the Final EA considered impacts from fencing. The Final EA states in part:

> DOFAW would subdivide the total fenced area into units of
> 2,000 to 4,000 acres that would be fenced over time, as
> funding becomes available. The final configuration and
> number of fenced unit(s) would consider factors such as
> water resources, quality of native ecosystems and habitat
> for native species, level of damage from ungulates, public
> use of area, cooperation with adjacent landowners, terrain,
>                                                    (continued...)

### 1. Reintroduction of the 'Alalā

PDF contends that reintroducing the 'Alalā into 'Io habitat would impact both birds, which are endangered, and thus, constitutes a significant effect. Under HAR § 11-200-12(b)(9), an action will have a significant effect on the environment if it "[s]ubstantially affects a rare, threatened, or endangered species, or its habitat[.]"

PDF contends that the Final EA is insufficient because DLNR disregarded the availability of other suitable release sites for the 'Alalā. However, DLNR's Final EA considered and evaluated a total of six release sites, three of which are in the Reserve. In a response to a letter submitted during the public comment period, DLNR noted:

> Reintroduction of captive-reared birds is an active area of conservation research and often requires multiple attempts and innovation before success is achieved ('Alalā Recovery Plan). Previous introductions of 'Alalā have not been successful; planned future releases will incorporate lessons learned from these previous attempts. Between 1993 and 1998, twenty-seven juvenile 'Alalā were released in South Kona. The South Kona location was chosen to allow for integration with the remaining wild population, but after their release twenty-one of the released birds died. The remaining six were recaptured and returned to the captive flock. Analysis following this attempt showed that habitat conditions in the release site were not optimal due to the degraded forest understory, the open forest canopy which made the 'Alalā vulnerable to predation by 'Io and other mammalian predators as well as disease (toxoplasmosis and other infections). Based on this analysis it is believed that a successful release site will require fencing a management area and removing ungulates to protect existing forest and enhance regeneration of understory vegetation; erecting holding or release aviaries at release sites; predator control; restoring food plants of the 'Alalā at the release site; and control of invasive species.

---

[5](...continued)
> logistics, accessibility, and feasibility for effective feral ungulate removal. Field surveys would be conducted to identify locations for the planned fence alignments, and final fence alignments would be sited to avoid any impact to botanical, faunal, and archaeological resources. Fences are not meant to restrict public access into management units, and walkovers and gates would be installed in order for people to access fenced areas.

The Final EA and Management Plan also state that DOFAW staff will conduct regular fence inspection and maintenance as necessary.

Additionally, staff will need to maintain a constant presence for an undetermined length of time to care for, feed, monitor, and track released birds.

The Reserve was determined to be a suitable site for the reintroduction of the 'Alalā because of the existing condition of the tree canopy and understory vegetation, as well as the reserve being within the historic range of the species. Vegetation at six potential 'Alalā release sites were assessed and ranked for suitability (Price, J. & J.D. Jacobi 2007). Three of the six potential sites were in the Reserve and each ranked high for suitable release sites. In reviewing this vegetation study, the Reserve was determined to be a high priority release site by the 'Alalā Recovery Implementation Team. The six potential 'Alalā release sites that are currently being considered are listed below in order of overall ranking for suitability. Alternative sites offered for release of the 'Alalā in the draft EA included the southwest, central and northern sites portions of the Reserve as well as the no action alternative. Releases may occur in multiple sites and all the areas listed below are still considered as potential alternatives for future releases.

[1]     Southwest Ka'ū: Southern portion of the Reserve and portions of the Kahuku section of Hawai'i Volcanoes National Park.

[2]     Keauhou-Kūlani: Portions of Keauhou Ranch, Kīlauea Forest, and Kūlani.

[3]     Central Ka'ū: Central portion of the Reserve northeast of the 1950 lava flow.

[4]     Kapāpala: Northern portion of the Reserve and portions of the Kapāpala Ranch and Kapāpala Forest Reserve.

[5]     Kona Forest Unit: Kona Forest Unit of Hakalau Forest National Wildlife Refuge and adjacent private lands.

[6]     Kona Hema: Kona Hema Preserve and the Honomālino Section of the South Kona Forest Reserve.


. . . .


The Division will continue to consult with [U.S. Fish and Wildlife Service (**USFWS**)] on all ongoing management activities, such as ungulate removal and invasive plant control that may have a potential impact to the 'Alalā. The 'Alalā will not be released into an area until the majority of animal control activities have been completed, and management of invasive plants will primarily occur in the lower elevation portions of the reserve whereas the release of the 'Alalā is currently proposed for high elevation areas where fewer invasive plants are present. The plan does not propose any specific management actions to protect the 'Alalā from predators such as the owl or 'Io. The Division and USFWS are developing a detail release plan, which may include provisions for training captive birds to avoid predators prior to release. Additionally, the Reserve has

been identified as a suitable release site due to the intact
forest canopy, which will help released birds hide from
predators.  The Division will be conducting studies to
determine 'Io density and its relationship to the
availability of rodents and game birds as well as vegetation
density.  This action is included in the management plan as
a proposed action related to the release of 'Alalā and has
not yet been implemented.

Furthermore, the Final EA reiterates that out of the
six sites examined for the reintroduction of the 'Alalā, the
"southwest and central Ka'ū study sites ranked first and second
overall[.]"  The Final EA explained that the "Reserve is a high
priority site to restore [the 'Alalā] to the wild due to the
large size and elevational range and diversity of wet and mesic
forest types, as well as the fact that the area recently
supported 'Alalā."  The Final EA recognizes that "restoration of
a wild population of 'Alalā will require minimizing threats,
including predator control, and protecting significant areas of
forest . . . from ungulates."  DLNR considered and evaluated
alternative release sites for the 'Alalā and found that the
selected site was one of the best suited to restore the 'Alalā to
the wild.

PDF also contends that the reintroduction of the 'Alalā
into the habitat of the 'Io fails to consider the significant
effect it may have on the 'Io.  PDF contends that the "hawk was
overshadowed by the EA's emphasis on the crow release idea--thus
providing another significant impact the EA did not address."
PDF argues that the Final EA fails to discuss conservation of the
'Io habitat.  However, the Final EA stated that the "'Alalā
release effort will involve both physical infrastructure such as
release aviaries and intensive research on 'Io density, habitat
and behavior and its interaction with 'Alalā."  Further, the
Final EA contains a section regarding the birds in the Reserve
and discusses how the native birds of Ka'ū (which includes the
'Io) would "benefit substantially."  In this regard, the Final EA
states:

16

> Most of the actions proposed as part of the Management Plan will produce highly beneficial impacts to native species. In particular, the protection of fencing, ungulate removal, weed control and outplanting are critical to the long-term health and recovery of native ecosystems that provides habitat for threatened and endangered plants and animals. Such actions are recommended parts of U.S. Fish and Wildlife Service Recovery Plans (see sub-appendix D of Appendix 1 for list).
>
> The native birds of Ka'ū will benefit substantially. Removal of feral ungulates will allow native understory plants and trees to regenerate, providing additional areas for birds to forage for fruit and nectar resources, and perpetuating the forest. Removing pigs will reduce the number of mosquito breeding sites, which reduces the transmission of avian diseases and the spread of non-native plants. The former is critically important as rising temperatures associated with climate change broaden the elevation band over which mosquitoes and the avian malaria parasite will be able to survive, reducing the overall area of disease-free native forest bird habitat.

PDF does not present a discernable argument as to how the Management Plan as it relates to the 'Io may have a significant negative effect. PDF's only argument appears to be a conclusory contention that without a further examination of the 'Io habitat, the Management Plan will have a significant impact on the environment.

In the Final EA, DLNR expressly considered HAR § 11-200-12(b)(9) and found that "[t]he project protects rare, threatened and endangered species and their habitat." Given the record, it appears there is substantial evidence to support DLNR's finding of no significant impact related to reintroduction of the 'Alalā in the Management Plan, such that the FONSI in this regard is not clearly erroneous; and the record does not indicate any genuine issue of material fact as to whether DLNR adequately considered the impacts from the planned reintroduction of the 'Alalā. See Kilakila 'O Haleakalā, 138 Hawai'i at 382-83, 382 P.3d at 194-95 (regarding the applicable standard for review).

17

## 2.   Removal of Ungulates

### i.   Significant Effect Issues

PDF asserts that the removal of ungulates (specifically pigs) constitutes a significant effect under HAR §§ 11-200-12(b)(1), (2), and (4).  HAR § 11-200-12(b) provides, in relevant part:

> In determining whether an action may have a significant effect on the environment, the agency shall consider every phase of a proposed action, the expected consequences, both primary and secondary, and the cumulative as well as the short-term and long-term effects of the action.  In most instances, an action shall be determined to have a significant effect on the environment if it:
>
> (1)   Involves an irrevocable commitment to loss or destruction of any natural or cultural resource;
>
> (2)   Curtails the range of beneficial uses of the environment;
>
> . . . .
>
> (4)   Substantially affects the economic welfare, social welfare, and cultural practices of the community or State[.]

In 2000, the legislature enacted Act 50 which added certain requirements for considering impacts on cultural practices due to proposed actions that are subject to the environmental review process.  2000 Haw. Sess. Laws Act 50 (hereinafter **Act 50**), § 1 at 93.  The legislature amended the definition of "significant effect" in HRS § 343-2 to include actions that "adversely affect . . . cultural practices of the community and State."  Act 50, § 2 at 93-94. The purpose of the amendment was to "clarify that the preparation of [EAs] or [EISs] should identify and address effects on Hawaii's culture, and traditional and customary rights."  Act 50, § 1 at 93.  The legislature recognized that

> the past failure to require native Hawaiian cultural impact assessments has resulted in the loss and destruction of many important cultural resources and has interfered with the exercise of native Hawaiian culture.  The legislature further finds that due consideration of the effects of human activities on native Hawaiian culture and the exercise

thereof is necessary to ensure the continued existence, development, and exercise of native Hawaiian culture.
Id.

Here, the Final EA includes a section entitled "Cultural Resources." It states in relevant part:

> [i]t is noteworthy that the domestic pigs raised by Hawaiians did not often enter the forest and were not apparently hunted (Maly and Maly 2004; Burrows et al 2007). The eminent Hawaiian ethnographer Kepā Maly conducted an extensive review of over 60,000 Hawaiian land documents ranging from 1846 to 1910 looking for references to *puaʻa*,[6] and "nearly every reference was in the context of them being near-home and as being cared for (raised), not hunted" (Maly and Maly 2004:200). Maly also reviewed writings from native authors such as Malo, ʻĪʻī, and Kamakau and discovered that the term "hunting" was rarely ever used in historical records, and that "hunting" referred to traditional collection of native birds for food or their feathers (2004). Burrows et al (2007) stated that the only reference to hunting of mammals in the archival resources and traditional knowledge sources they reviewed was to hunting rats with bows and arrows. In the early 1800s hunting was a more common practice for Native Hawaiians, but they were primarily hunting bullocks, goats and other introduced grazers. Additionally, these hunting practices were mainly carried out at the request of landlords and ranchers.

Keala Pono Archaeological Consulting also prepared a Cultural Impact Assessment (**CIA**) which is attached as Appendix 2 to the Final EA. The CIA was prepared using "archival research as well as community consultation with knowledgeable parties recognized as having a cultural, historical, genealogical, or managerial connection to the project area in Kaʻū." The CIA states in the relevant part:

> [w]hile the issue of whether hunting *puaʻa* is a traditional cultural practice was not specifically brought up in the consultation process, it should be briefly mentioned here, as there continues to be differing opinions on whether or not hunting for pigs is considered a traditional cultural

---

[6] Puaʻa is defined as "[p]ig, hog, swine, pork." Mary Kawena Pukui & Samuel H. Elbert, <u>Hawaiian Dictionary</u> 344 (rev. ed. 1986) (**"Hawaiian Dictionary"**).

practice. As evident in the *mana'o*[7] provided by the community participants of Ka'ū, all of them stated that they rely on hunting for subsistence, and some of them also believe that the *pua'a* is an integral component of a healthy, balanced forest. Furthermore, it was stated that hunting has occurred for generations in Ka'ū, and the knowledge of this practice has also been passed on.

However, some cultural practitioners, scientists and historians, such as Dr. Charles Burrows, Kepa Maly, and Charles Isaacs Jr. have researched and presented materials indicating that pigs were never hunted game for ancient Hawaiians (2007). Rather, Hawaiians had domesticated pigs and never had the need to hunt them. Furthermore, Burrows et al. (2007) state that the only reference to hunting in the archival resources and from traditional knowledge sources that they reviewed was to hunting rats with bows and arrows. While they admit that the *pua'a* did play an important role in Hawaiian history because of its function as a food source and cultural symbol, they were never utilized for recreational or subsistence hunting.

Despite the uncertainty expressed in the CIA, DLNR recognized that pig hunting "is considered by many to be a cultural practice[.]" According to DLNR, 139 residents in Ka'ū District had hunting licenses in 2010. The Final EA also notes that an unknown number of Ka'ū residents hunt in the Reserve without hunting licenses. DLNR evaluated three alternative sites for the implementation of the Management Plan, and concluded that implementation of Alternative B would not have a "substantial impact on hunting, based on its relatively remote location and the fact that it takes up only 20% of the Reserve, leaving other areas open to hunting[.]" (Emphasis omitted). DLNR provides "over 600,000 acres of public hunting on the Island of Hawai'i" and only about "4 percent is currently fenced with hooved animal populations effectively controlled." The Final EA "emphasizes increasing access to lower portions of the Reserve to allow for public hunting while increasing watershed and native ecosystem protection in more remote, inaccessible upper portions of the

---

7 Mana'o is a "[t]hought, idea, belief, opinion[.]" <u>Hawaiian Dictionary</u> at 236.

Reserve through fencing of management units and removal of feral ungulates." Moreover, in response to comment on the Management Plan, DLNR stated that the "[l]ocations for fencing and ungulate management were chosen in areas where few hunters currently access due to the remoteness of the site in order to minimize any significant impact to major hunting areas." Thus, the Final EA considers the cultural implications of the Management Plan and the effect on hunters.

Regarding PDF's argument that the removal of pigs from the management area constitutes a significant effect on the environment under HAR §§ 11-200-12(b)(1), (2), and (4), PDF provides no clear argument demonstrating how it "[i]nvolves an irrevocable commitment to loss . . . of any natural or cultural resource[,]" "[c]urtails the range of beneficial uses of the environment[,]" or "affects the economic welfare, social welfare, and cultural practices of the community[.]" The Final EA evaluates the factors that must be considered when determining whether an action has a significant effect on the environment under HAR § 11-200-12(b), stating in relevant part:

> 1) *Involves an irrevocable commitment to loss or destruction of any natural or cultural resource.*
> Implementation of the Plan would benefit biological and watershed resources, including natural resources utilized for cultural practices. Impacts to pig hunting, which is considered by many to be a cultural practice, would occur but be less than significant because of the proposed locations of management areas. DOFAW seeks to balance providing public hunting opportunities in the Reserve with the protection of native ecosystems and watersheds, and the Plan includes actions to substantially facilitate public hunting in the Reserve.
>
> 2) *Curtails the range of beneficial uses of the environment.*
> No aspect of the Plan would curtail any beneficial use in the long term, and implementation would sustain many beneficial habitat and watershed uses that would otherwise be jeopardized if not lost.
>
> . . . .

> *4) Substantially affects the economic or social welfare of the community or state.*
> The proposed action will not substantially affect the economic or social welfare of the community or State. It is expected to contribute to the economic and social well-being of local communities and the State through long-term improvement in the health of native forests and watersheds. <u>Effects to pig hunting will not be significant, and other subsistence resources produced in or by the Reserve would be substantially enhanced</u>. Healthy native forests offer recreational, cultural and watershed values that contribute to social welfare.

(Emphasis added.)

Thus, DLNR considered the factors under HAR § 11-200-12(b) as they pertain to removal of pigs in the Management Plan and found no significant impact.

The Final EA also included as Appendix 3, the comments received and DLNR's responses during the public review and comment phase.[8] DLNR's responses to comments reflect that Alternative B was chosen for its remote location and minimized impact on hunting to major hunting areas. DLNR noted it had conducted numerous field trips and meetings with local hunters and chose Alternative B because "few hunters currently access [the specific portion of the Reserve] due to the remoteness of the site[.]" Moreover, 80% of the Reserve will still be available and open for hunting use. DLNR determined that any affect to the hunters will be "mitigated by increasing access to large portions of the Reserve still available for hunting and by involving hunters in ungulate removal activities."

Given the record, DLNR's finding that the Management Plan would not cause a significant impact with regard to the removal of ungulates was not clearly erroneous, and the record

---

[8] PDF points to a public meeting held on June 2, 2012 where almost 100 Ka'ū residents and hunters attended and there was opposition to any fencing or ungulate control. The Final EA reflects the criticism of the Management Plan by members of the public, and also provides DLNR's responses to comments.

does not indicate any genuine issues of material fact relating to whether DLNR adequately considered the environmental impacts from removing pigs from the management area before issuing the FONSI. See Kilakila 'O Haleakala, 138 Hawai'i at 382-83, 382 P.3d at 194-95 (regarding the applicable standard for review).

### ii. Traditional Hawaiian Rights Under Article XII, section 7

PDF also argues that pig hunting is a constitutionally protected traditional and customary native Hawaiian right and thus DLNR's plan to remove pigs from the designated area constitutes a *per se* violation of Article XII, section 7 of the Hawai'i Constitution. PDF cites no authority for its assertion of a *per se* violation.

Article XII, section 7 states: "The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupua'a[9] tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights."

In State v. Hanapi, 89 Hawai'i 177, 970 P.2d 485 (1998), the Hawai'i Supreme Court held:

> In order for a defendant to establish that his or her conduct is constitutionally protected as a native Hawaiian right, he or she must show, at minimum, the following three factors. First, he or she must qualify as a "native Hawaiian" within the guidelines set out in [*Public Access Shoreline Hawaii v. Hawai'i Cty. Planning Comm'n*, 79 Hawai'i 425, 903 P.2d 1246 (1995) (**PASH**)]. . . . PASH stated that "those persons who are 'descendants of native Hawaiians who inhabited the islands prior to 1778,' and who assert otherwise valid customary and traditional Hawaiian rights are entitled to [constitutional] protection *regardless of their blood quantum*."
>
> Second, once a defendant qualifies as a native Hawaiian, he or she must then establish that his or her claimed right is constitutionally protected as a customary or traditional native Hawaiian practice. . . .

---

[9] Ahupua'a is a "[l]and division usually extending from the uplands to the sea[.]" Hawaiian Dictionary at 9.

> Finally, a defendant claiming his or her conduct is constitutionally protected must also prove that the exercise of the right occurred on undeveloped or "less than fully developed property."

Id. at 185-86, 970 P.2d at 493-94 (citations and footnote omitted); see also State v. Pratt, 127 Hawaiʻi 206, 207, 277 P.3d 300, 301 (2012).

Given the record in this case, PDF has not established that its members or the individual plaintiffs meet the Hanapi test such that they have a constitutionally protected traditional and customary native Hawaiian right to hunt pigs in the Kaʻū Forest Reserve. None of the declarations or evidence submitted by PDF in this case demonstrate that the three-part Hanapi test is met by any particular individual. At most, Ralph Palikapu Dedman attests generally in his declaration that "Plaintiffs are exercising customary and traditional cultural and subsistence rights possessed by ahupuaʻa tenants who are descendants of native Hawaiians inhabiting the Hawaiian islands prior to 1778." However, this statement does not provide any specifics as to any individual. "Bare allegations or factually unsupported conclusions are insufficient to raise a genuine issue of material fact, and therefore, insufficient to reverse a grant of summary judgment." Reed v. City & Cty. of Honolulu, 76 Hawaiʻi 219, 225, 873 P.2d 98, 104 (1994) (citations omitted); Chuck Jones & MacLaren v. Williams, 101 Hawaiʻi 486, 501, 71 P.3d 437, 452 (App. 2003) (holding that "conclusory statements, in and of themselves and devoid of specific supporting facts, were not sufficient to raise [a] genuine issue of material fact[.]"); Hawaii Rules of Civil Procedure, Rule 56(e) (a party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").

Moreover, as to the second Hanapi factor, the Hawaiʻi Supreme Court expressed that: "To establish the existence of a traditional or customary native Hawaiian practice, we hold that

24

there must be an <u>adequate foundation in the record connecting the claimed right to a firmly rooted traditional or customary native Hawaiian practice</u>."[10] <u>Hanapi</u>, 89 Hawai'i at 187, 970 P.2d at 495 (emphasis added and footnote omitted). Here, the declarations submitted by PDF do not provide a foundational basis for assertion of a traditional or customary native Hawaiian practice, for instance in the form of an asserted specialized knowledge or *kama'aina* witness testimony, as it relates to pig hunting in the Ka'ū Forest Reserve.[11]

Even if PDF had presented evidence to establish a plaintiff's constitutionally protected right to pig hunting in the Ka'ū Forest Reserve, this would not end the analysis.

> The privilege afforded for native Hawaiian practices, as expressed in our State constitution and statute, is not absolute. The language of the provisions protecting customary native Hawaiian practices display a textual commitment to preserving the practices while remaining mindful of competing interests. For example, the constitutional language protecting the right to traditional and customary practices is <u>qualified by the phrase "subject to the right of the State to regulate such rights</u>."

<u>Pratt</u>, 127 Hawai'i at 213, 277 P.3d at 307 (citation omitted) (emphasis added). With regard to the case law addressing native Hawaiian rights, the Hawai'i Supreme Court noted that "[a] common

---

[10] An adequate foundation in this context may be established by specialized knowledge showing the claimed right is a traditional or customary native Hawaiian practice, such as through expert testimony pursuant to Hawai'i Rules of Evidence Rule 702. <u>Hanapi</u>, 89 Hawai'i at 187 n.12, 970 P.2d at 495 n.12. Hawai'i courts "have also accepted kama'aina witness testimony as proof of ancient Hawaiian tradition, custom, and usage." <u>Id.</u>; <u>see also</u> <u>State v. Palama</u>, No. CAAP-12-0000434, 2015 WL 8566696 (Haw. App. Dec. 11, 2015) (mem. op.)

[11] PDF also points to a Final Judgment and Findings of Fact and Conclusions of Law (**FOF/COL**) entered by the Honorable Riki May Amano in a case entitled <u>Pele Defense Fund v. The Estate of James Campbell</u>, Civil No. 89-089 (Hilo), Circuit Court of the Third Circuit, which required that native Hawaiians be permitted to practice customary and traditional rights in Wao Kele 'O Puna Natural Area Reserve and Puna Forest Reserve, in the Puna District of the Island of Hawai'i, which was owned by Campbell Estate. Judge Amano's Final Judgment and FOF/COL were attached to Dedman's declaration. However, Judge Amano's ruling concerns land situated in the Puna District, not the Ka'ū Forest Reserve, and as reflected in Judge Amano's FOF/COL, the evidence and findings in that case related specifically to the area of the Puna district, and thus are not applicable to this case.

thread tying all these cases together is an attempt to balance the protections afforded to native Hawaiians in the State, while also considering countervailing interests." Id. at 215, 277 P.3d at 309.

As pertains to environmental review under HEPA, the State regulates traditional and customary practices, in part, by requiring in the definition of "significant effect" consideration as to whether actions would adversely affect "cultural practices." HRS § 343-2. Here, review of the Final EA, Cultural Impact Assessment, and the public comments and responses demonstrate that DLNR acknowledged that pig hunting may be a native Hawaiian practice that needed to be adequately considered in its Final EA. DLNR specifically stated that pig hunting "is considered by many to be a cultural practice[.]" DLNR stated that impacts to pig hunting would occur but "be less than significant because of the proposed locations of management areas." Further, the Final EA states that the Management Plan preserves pig hunting for those who wish to practice it. The Final EA lists all of the individuals and organizations from whom it received comments during the public comment period. In its responses, DLNR addressed concerns raised about pig hunting. Ultimately, Alternative B was selected because hunters do not hunt as often in that portion of the Reserve. Under the Management Plan, public hunting will be encouraged during the initial phase of removing pigs from fenced units. Further, the remaining eighty percent of the Reserve will be available for hunters. On this record, DLNR examined the public's concern regarding native Hawaiian rights pertaining to pig hunting and on balance determined that some regulation was necessary to preserve the native ecosystem and watershed.

Given the above, we disagree with PDF's claim that DLNR's plan to remove pigs from the designated area constitutes a per se violation of Article XII, section 7.

26

Although the circuit court applied an incorrect standard in reviewing DLNR's issuance of the FONSI, we conclude for the reasons discussed above that the circuit court did not err in granting summary judgment in favor of DLNR.

### C.    **Attorneys' Fees**

One of DLNR's arguments before the circuit court was that the Management Plan was exempt from preparation of an EA, but that an EA was done as an extra layer of review and protection.  In turn, PDF asserted that DLNR's exemption argument was frivolous and that PDF was thus entitled to attorneys' fees and costs under HRS § 607-14.5.[12]  The circuit court disagreed with PDF and denied its request for attorneys' fees and costs.

---

[12]  HRS § 607-14.5 provides, in relevant part:

> **§607-14.5  Attorneys' fees and costs in civil actions.**
> (a) In any civil action in this State where a party seeks money damages or injunctive relief, or both, against another party, and the case is subsequently decided, the court may, as it deems just, assess against either party, whether or not the party was a prevailing party, and enter as part of its order, for which execution may issue, a reasonable sum for attorneys' fees and costs, in an amount to be determined by the court upon a specific finding that all or a portion of the party's claim or defense was frivolous as provided in subsection (b).
>
> (b) In determining the award of attorneys' fees and costs and the amounts to be awarded, the court must find in writing that all or a portion of the claims or defenses made by the party are frivolous and are not reasonably supported by the facts and the law in the civil action. In determining whether claims or defenses are frivolous, the court may consider whether the party alleging that the claims or defenses are frivolous had submitted to the party asserting the claims or defenses a request for their withdrawal as provided in subsection (c). . . .
>
> (c) A party alleging that claims or defenses are frivolous may submit to the party asserting the claims or defenses a request for withdrawal of the frivolous claims or defenses, in writing, identifying those claims or defenses and the reasons they are believed to be frivolous.

(Emphasis added).

27

On appeal, PDF disputes the following determination by the circuit court:

> The claim for attorney's fees in Footnote 8 of *Plaintiffs' Memorandum Opposing State of Hawaii's Motion for Summary Judgment Filed December 5, 2013* ("Footnote 8") is denied. In adjudicating the *Motion for Summary Judgment*, the Court did review the Party's arguments on the exemption issue. The Court finds that the claim is not frivolous as the term is defined pursuant to Hawaii Revised Statutes § 607-14.5 and Hawaii case law.

A frivolous claim is "a claim so manifestly and palpably without merit, so as to indicate bad faith on the pleader's part such that argument to the court was not required." Taqupa v. VIPDesk, 135 Hawai'i 468, 479, 353 P.3d 1010, 1021 (2015) (citations, brackets and internal quotation marks omitted). "A finding of frivolousness is a high bar; it is not enough that a claim be without merit, there must be a showing of bad faith." Id. (citations omitted).

In its summary judgment motion, DLNR argued that the Management Plan was exempt from the preparation of an environmental assessment because the Environmental Council had approved an applicable exemption. Pursuant to HAR 11-200-8(d), DLNR had submitted a list of department-wide exemptions to the Environmental Council. DLNR asserted that it had obtained an exemption on July 13, 2011, identified as Exemption 3 Class 1, which provided exemption for "[f]ences around or to manage rare, threatened or endangered plants, covered and open areas for endangered species, game birds and mammals; . . . and for watershed and native forest management and restoration." DLNR asserted that despite the availability of Exemption 3 Class 1, it had prepared the EA to "provide a further layer of review and protection, and to seek public comment regarding the proposed action."

The circuit court did not rely on the purported exemption in granting DLNR's summary judgment motion. However,

the circuit court noted that it had reviewed the party's arguments on the exemption issue and found that DLNR's claim was not frivolous under HRS § 607-14.5. We conclude the circuit court did not abuse its discretion. In this case, the parties disputed a variety of issues, including the applicable standard for judicial review of DLNR's actions. Even if not meritorious, there is no showing that DLNR's exemption argument was made in bad faith. Tagupa, 135 Hawai'i at 479, 353 P.3d at 1021. As such, the circuit court did not abuse its discretion in denying PDF's request for attorneys' fees and costs under HRS § 607-14.5.

## IV. Conclusion

Based on the above, the Amended Final Judgment, filed on July 24, 2014, in the Circuit Court of the Third Circuit is affirmed.

DATED: Honolulu, Hawai'i, January 22, 2018.


On the briefs:

James M. Dombroski,
for Plaintiffs-Appellants.


William J. Wynhoff,
Colin J. Lau,
Deputy Attorneys General,
Department of Attorney General,
for Defendants-Appellees.

Presiding Judge

Associate Judge

Associate Judge